# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 48913

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | Filed: December 16, 2022 |
| Plaintiff-Respondent, | ) | |
| | ) | Melanie Gagnepain, Clerk |
| v. | ) | |
| | ) | THIS IS AN UNPUBLISHED |
| EMILY MAE TALBERT, | ) | OPINION AND SHALL NOT |
| | ) | BE CITED AS AUTHORITY |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Blaine County. Hon. Ned C. Williamson, District Judge.

Judgment of conviction for driving under the influence, third offense, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Andrea W. Reynolds, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Justin R. Porter, Deputy Attorney General, Boise, for respondent.

---

HUSKEY, Judge

Emily Mae Talbert appeals from her judgment of conviction for driving under the influence (DUI), third offense, a felony offense pursuant to Idaho Code §§ 18-8004, 18-8005(6). Talbert alleges the district court erred in denying her motion to suppress because she was arrested for a misdemeanor offense completed outside the police officer's presence in violation of Article I, § 17 of the Idaho Constitution as interpreted in *State v. Clarke*, 165 Idaho 393, 446 P.3d 451 (2019). When determining whether a seizure constitutes a de facto arrest, we look to whether the detention was reasonable under the totality of the circumstances. Because Talbert's seizure was reasonable under the circumstances, it did not constitute an arrest for a misdemeanor committed outside the officer's presence in violation of Idaho constitutional standards. Accordingly, the district court did not err in denying Talbert's motion to suppress. The judgment of conviction is affirmed.

1

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

The following factual findings were made by the district court and are undisputed on appeal. Sergeant Pritchard responded to a single car accident on a rural highway in Blaine County. When he arrived at the scene, Sgt. Pritchard saw a blue car in the sage brush, approximately seventy feet off the highway. Sgt. Pritchard spoke to several witnesses who were gathered at the scene, and he was told the blue car had passed several cars in a no passing zone before veering off the highway while attempting to pass a truck. Next, Sgt. Prichard contacted Talbert, the driver, who was uninjured and standing by her car. Talbert stated she was forced to drive off the highway to avoid hitting a semi-truck that was in the middle of the road. Talbert was visibly upset and Sgt. Pritchard suggested she follow him to his patrol car where she could get warm and fill out an accident report form. Talbert complied.

Once back at the patrol car, Sgt. Pritchard gave Talbert the accident report form and asked for, and received, Talbert's driver's license. Sgt. Prichard relayed Talbert's driver's license information to dispatch and learned there was a "caution-fleeing" warning on her record. Sgt. Prichard then removed the keys from his patrol car, left Talbert standing by his patrol car to complete the accident report form, and walked over to survey the scene of the accident.

Sgt. Pritchard returned to his patrol car and reviewed Talbert's completed accident report form. Sgt. Pritchard then told Talbert that he smelled alcohol on her breath and asked if she had consumed any alcohol or was under the influence of prescription medication or drugs. Talbert denied consuming any alcohol, but admitted that she took a prescription medication for a skin condition that morning and had smoked marijuana four days earlier. Sgt. Pritchard administered a horizontal gaze nystagmus (HGN) test and observed that Talbert met all six-decision points, indicating she failed the test. Sgt. Pritchard did not administer other field sobriety tests because Talbert explained her ability to complete the tests was inhibited by a traumatic brain injury she sustained in a previous car accident which resulted in her having to relearn how to walk and talk. At this point, Sgt. Pritchard advised Talbert, "at this time I'm going to need you to turn around and put your hands behind your back, you are not under arrest at this time, you are being detained for suspicion of DUI." Sgt. Pritchard handcuffed Talbert, explained the blood alcohol concentration (BAC) breath testing procedure and reiterated to Talbert that she was not under arrest and that he handcuffed her for his safety because he was the only law enforcement officer in the area.

2

Sgt. Pritchard placed Talbert in the back seat of his patrol car and shut the car door, but left the window rolled down. Sgt. Pritchard played an audio recording explaining the breath testing procedure to Talbert and began the mandatory fifteen-minute observation period before administering the breath tests. During this period, Sgt. Pritchard remained by the patrol car where he prepared the breath testing instrument and conversed with Talbert. Sgt. Pritchard advised Talbert that even if the results of the breath test indicated she had been driving under the influence, he would be issuing her a citation, not taking her to jail, because of a new Idaho Supreme Court opinion concerning misdemeanors that occur outside of an officer's presence.

After the conclusion of the fifteen-minute observation period, Sgt. Pritchard administered the breath tests. During the first test, Talbert sucked on the machine's straw instead of blowing into it, causing the test to fail. Then Talbert burped, which required Sgt. Pritchard to begin the fifteen-minute observation period anew. During the second fifteen-minute waiting period, another officer arrived and notified Sgt. Pritchard that Talbert had two prior convictions for driving under the influence within the last ten years. After the conclusion of the second fifteen-minute waiting period, Talbert provided breath samples that registered BACs of .172 and .166, both over the .08 legal limit. Sgt. Pritchard formally placed Talbert under arrest.[1]

The State charged Talbert with DUI, a third offense within ten years, a felony, I.C. §§ 18-8004(1)(a), 18-8005(6). Talbert filed a motion to suppress arguing she was subject to a de facto and unconstitutional arrest for a misdemeanor committed outside of an officer's presence when she was handcuffed and placed in the back of the patrol car because Sgt. Pritchard did not learn about her two previous DUI convictions (which eventually gave rise to the felony charge) until later in the investigation. The State opposed the motion, arguing that Talbert was subjected to an investigatory detention until Sgt. Pritchard formally placed her under arrest after Talbert registered BACs of .172 and .166 and, additionally, she consented to the breath tests. The district court held a hearing on Talbert's motion to suppress at which Sgt. Pritchard testified and the body camera footage of the incident, the initial report of the arrest, and the preliminary hearing transcript were admitted as evidence. The district court found Talbert was subjected only to an investigative

---

[1]     Marijuana paraphernalia was found during a subsequent inventory of Talbert's car, and Talbert was charged with misdemeanor possession of drug paraphernalia, Idaho Code § 37-2734A. The charge was dismissed pursuant to the plea agreement and is not at issue in this appeal.

detention when Officer Pritchard handcuffed her and placed her in the back of his patrol car and, therefore, the court denied Talbert's motion to suppress.

Pursuant to a conditional plea agreement, Talbert pleaded guilty to felony DUI, reserving the right to appeal the denial of her motion to suppress. Talbert timely appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

## III.

## ANALYSIS

Talbert alleges the district court erred in denying her motion to suppress because she was arrested for a misdemeanor offense completed outside of the officer's presence in violation of Article I, § 17 of the Idaho Constitution as interpreted in *Clarke*, 165 Idaho 393, 446 P.3d 451 when Sgt. Pritchard handcuffed her and placed her in the back of his patrol car. In response, the State argues that Talbert was subject to a lawful, investigative detention at the time in question and, therefore, the district court did not err.

In *Clarke*, the Idaho Supreme Court held that an officer violates the Idaho Constitution if he makes "an arrest for a misdemeanor offense that occurred outside his presence" even if probable cause exists for that arrest. *Clarke*, 165 Idaho at 396, 446 P.3d at 454. As such, a driver may not be arrested for the misdemeanor DUI if the offense was committed outside of the arresting officer's presence. *Reagan v. Idaho Transportation Dep't*, 169 Idaho 689, 698, 502 P.3d 1027, 1036 (2021). Knowledge gained after an unconstitutional arrest does not remedy the unconstitutionality of the arrest; therefore, even if the arresting officer later learns that he could have arrested a driver for felony DUI based on previous convictions in her criminal record, this knowledge is insufficient to retroactively support the arrest. *State v. Amstutz*, 169 Idaho 144, 148, 492 P.3d 1103, 1107 (2021)

4

(holding that officer looked at "driver's return" only after misdemeanor arrest and gained sufficient knowledge to support probable cause for felony arrest; by then unconstitutional arrest had been made for misdemeanor DUI and no amount of knowledge gathered after-the-fact could remedy situation). Thus, the inquiry is whether Sgt. Pritchard's use of handcuffs and placement of Talbert in the back of his patrol car transformed the investigative detention into a de facto arrest for a misdemeanor offense committed outside of his presence.

Where a person is detained, the scope of the detention must be carefully tailored to its underlying justification. *State v. Roe*, 140 Idaho 176, 181, 90 P.3d 926, 931 (Ct. App. 2004); *State v. Parkinson*, 135 Idaho 357, 361, 17 P.3d 301, 305 (Ct. App. 2000). In this regard, we must focus on the intensity of the detention, as well as its duration. *Roe*, 140 Idaho at 181, 90 P.3d at 931. Whether the Fourth Amendment is violated during the course of an investigatory detention is not automatically answered by the assessment of whether police tactics did or did not amount to a "de facto" arrest. *State v. Stewart*, 145 Idaho 641, 645, 181 P.3d 1249, 1253 (Ct. App. 2008). Rather, the relevant question is whether the detention was reasonable under the totality of the circumstances. *Id.* Factors to be considered when evaluating the totality of the circumstances include the seriousness of the crime or crimes under investigation, the location and length of the detention, the reasonableness of the display of force by officers, and the conduct of the suspect while the encounter unfolds. *See State v. Martinez*, 129 Idaho 426, 431, 925 P.2d 1125, 1130 (Ct. App. 1996). If the detention is not reasonable under the totality of the circumstances, the seizure constitutes a de facto arrest that must comport with applicable statutory and constitutional standards.

### A. Seriousness of the Crime

Talbert acknowledges the district court correctly found that DUI is a serious offense and the seriousness of this offense weighed against a finding that Talbert was arrested; thus, we need not address it further.

### B. Location of the Encounter

The district court found the location of the accident weighed in favor of the use of handcuffs. The district court relied, in part, on the flight caution warning provided to Sgt. Pritchard by dispatch. Talbert acknowledges that more restrictive tactics are permitted where a suspect is likely to flee, *State v. Pannell*, 127 Idaho 420, 424, 901 P.2d 1321, 1325 (1995), but argues that any reliance on the flight warning was unwarranted because Talbert did not attempt to flee and

5

since there was nowhere Talbert could flee, there was no risk of flight. We disagree that there was nowhere Talbert could flee as Sgt. Pritchard testified Talbert could have left the scene either by getting a ride from a vehicle or on foot and Talbert had expressed a general anxiousness to leave. Talbert did not cite any authority that limits an officer's assessment of a flight risk to a situation where a suspect attempts to flee or where the risk assessment must be based on the likelihood of success of that flight.

Moreover, Sgt. Pritchard had information that Talbert wanted to leave the scene prior to his arrival. A review of the body camera footage admitted at the hearing shows that when Sgt. Pritchard arrived, two witnesses reported that after Talbert wrecked her car, she asked the witnesses not to call the police, and she tried to leave the scene. One witness stated that he stayed at the scene to ensure Talbert did not leave. Thus, by the time Sgt. Pritchard was informed of the flight warning, he already had information that Talbert expressed a desire to leave the scene.

The district court also considered that the encounter took place on the side of a highway in inclement weather[2] and in a remote area with no buildings or houses nearby. The court noted that Talbert's placement inside Sgt. Pritchard's patrol car was more comfortable for Talbert to complete breath tests given the weather and it was easier for Sgt. Pritchard to monitor Talbert during the fifteen-minute waiting period prior to administering the breath test. As a result, the district court found that the location weighed against a finding of arrest.

### C. Length of Detention

In assessing the length of the detention, the district court found the initial encounter was consensual and did not become an investigative detention until Sgt. Pritchard asked Talbert to perform field sobriety tests. The district court further found that Sgt. Pritchard did not unnecessarily prolong the detention, and Talbert did not argue or identify a point where Sgt. Pritchard engaged in unnecessary delay. Ultimately, the district court concluded that the length of the detention was no longer than necessary for Sgt. Pritchard to administer the breath test and, thus, weighed against a finding that Talbert was arrested when she was handcuffed. Talbert

---

[2]    Talbert takes issue with the district court's factual finding that it was raining stating, "[at] the time Officer Pritchard was on scene, it was not raining, though it appears to have been raining earlier." While it may not have been raining at the precise moment of Sgt. Pritchard's arrival, the bodycam shows if not raining at subsequent points in the encounter, certainly there was a great deal of moisture in the air.

argues that because she was detained for approximately fifty-one minutes, it was not a brief detention and was longer than was necessary to effectuate the stop. Talbert fails to acknowledge that any detention beyond the initial fifteen-minute observation period is attributable to Talbert.

Sgt. Pritchard told Talbert she would need to wait in the car for fifteen minutes before the breath test, during which time she could not burp, belch, or vomit, and if she did, the fifteen-minute period would begin anew. After the initial fifteen minutes, Talbert did not blow into the breathalyzer, as instructed; instead, she sucked on the straw.[3] This invalidated the test and as a result, Sgt. Pritchard had to wait another fifteen minutes before administering the test. During the second period, Talbert belched and blamed it on the fact that she had consumed Coca-Cola while driving. That again caused the fifteen-minute waiting period to begin anew. Thus, any and all delay past the initial fifteen-minute period is attributable to Talbert, and the district court correctly found this factor weighed against finding Talbert was arrested at the time she was placed in handcuffs.

### D.       The Reasonableness of the Display of Force by Officers

When considering the reasonable display of force by the officer, i.e., using handcuffs and placing Talbert in the back of the patrol car, the district court found this factor slightly weighed against a finding of arrest. The district court found that the use of handcuffs was reasonable for safety and non-safety concerns. As to safety, the district court found that the use of handcuffs was reasonable because Sgt. Pritchard was the only officer on scene at the time and Talbert's behavior made her detention more unpredictable if she was not handcuffed. The district court found there were additional, non-safety reasons justifying placing Talbert in the patrol car: it was easier to monitor Talbert during the fifteen-minute waiting period; the administration of the breath test was best administered in the patrol car given the weather; the CD explaining the breath test was played through the patrol car's sound system; and the breathalyzer machine was assembled on the front seat of the patrol car.

Sgt. Pritchard testified that he did not believe Talbert to be armed or dangerous and Talbert generally complied with his requests.[4] However, Sgt. Pritchard also testified that Talbert's

---

[3]      Talbert fails to include this fact in her briefing.

[4]      Talbert's behavior deteriorated significantly once she was placed in handcuffs. For example, Talbert told Sgt. Pritchard that she wished she could take his gun and shoot herself; she wished she had died in a previous driving under the influence accident; and she wished she was dead. Upon the tow truck's arrival, Talbert yelled to the tow truck driver to tow her car back to

7

answers on the form were "abnormal" and were "not consistent with an average crash form or anything like that." For example, Talbert wrote that she had driven "400" hours on her trip, although she stated she was coming from Idaho Falls; her insurance policy number was "19"; and the state issuing her driver's license was "18." Additionally, Sgt. Pritchard explicitly told Talbert that she could not be arrested for a misdemeanor committed outside his presence, on three different occasions; she was not under arrest; and she was being handcuffed for his safety. Sgt. Pritchard rolled down the back passenger window and continued to converse with Talbert while she was in the back seat. A review of the body camera footage shows that throughout the encounter, Talbert was emotionally and behaviorally erratic and her conversation was, at times, inappropriate or non-responsive. Finally, Sgt. Pritchard was aware of the "caution-fleeing" warning and he was told by witnesses that Talbert attempted to leave the scene before he arrived. Taken together, Talbert's compliant but erratic emotional status, and her irregular, inappropriate, and non-responsive behavior, coupled with her flight risk and previous attempts to leave the scene, support the district court's finding that Sgt. Pritchard's use of force was reasonable and as a result, weighs against a finding of arrest.

### E.      The Conduct of the Suspect During the Encounter

The district court found Talbert's conduct weighed in favor of finding that the use of handcuffs was unreasonable because Talbert had been "mostly cooperative" with Sgt. Pritchard's requests. Talbert asserts this finding is correct because Talbert "did not display any type of behavior that would warrant the officer's use of handcuffs." As noted above, this statement is not entirely accurate. For example, Sgt. Pritchard asked Talbert to fill out the accident report form at his police car; Talbert filled out the front page of the form but not the back of the form and her answers were abnormal. Talbert began walking back towards her car until Sgt. Pritchard instructed Talbert to remain by his patrol car. Talbert repeatedly discussed a previous car accident in which she "died," even when that information was non-responsive to the question, or she volunteered information when there was no question put to her. While Sgt. Pritchard was administering the HGN test, Talbert complimented him on his hands.

Idaho Falls. Sgt. Pritchard told her that she could not speak with the tow truck operator until after she completed the breath testing, and Talbert became verbally assaultive and physically uncooperative. We note, however, that this behavior occurred after Talbert was handcuffed and placed in the back of Officer Pritchard's patrol car and, thus, it is not considered in the analysis.

While we agree with Talbert that "being visibly upset and behaving erratically does not equate to being disobedient," that does not make the converse--that being mostly cooperative leaves an officer with no cause for concern--necessarily true. The district court considered each of the above factors, made factual findings that are supported by substantial and competent evidence, and concluded that given the totality of the circumstances in this case, Sgt. Pritchard's decision to handcuff Talbert was reasonable. We decline to find the district court erred.

## F.      Reagan Is Not Dispositive in This Case

Notwithstanding the district court's analysis, Talbert argues the district court did not have the benefit of the *Reagan* decision and this case is virtually undistinguishable from *Reagan*. There, a police officer responded to Reagan's residence after receiving a report from a concerned citizen of a potentially intoxicated female driving a car registered to Reagan. *Reagan*, 169 Idaho at 692, 502 P.3d at 1030. Reagan was in her home fixing dinner for her family. *Id.* at 697, 502 P.3d at 1035. Reagan admitted consuming alcohol and driving and she submitted to field sobriety testing, which indicated she was impaired. *Id.* at 692, 502 Idaho 1030. The officer handcuffed Reagan and placed her in the back of a patrol vehicle, informing her that she was under arrest. *Id.* Subsequent breath testing indicated Reagan's BAC exceeded the legal limit, which led to the suspension of Reagan's driver's license under I.C. § 18-8002A. *Id.* at 692-93, 502 P.3d at 1030-31. Reagan appealed, and the district court reversed the license suspension holding, in part, that the hearing officer's decision concerning the legality of the stop was arbitrary, capricious, or an abuse of discretion because Reagan's arrest was not legal. *Id.* at 693, 502 Idaho 1031. The Idaho Transportation Department (Department) subsequently appealed. *Id.* at 692, 502 P.3d at 1030.

On appeal, the Idaho Supreme Court affirmed the district court's decision vacating the one-year license suspension. *Id.* at 700, 502 P.2d at 1038. The Court noted that Reagan complied with the officer's requests, did not pose a threat to the officer, and was suspected of a nonviolent offense that the officer had not witnessed. *Id.* at 697, 502 P.3d at 1035. The Court held that, considering the totality of the circumstances, "the act of handcuffing Reagan exceeded the bounds of what was reasonably intrusive in conducting an investigative detention" and constituted an arrest. *Id.* Thus, the Court concluded that Reagan was arrested without a warrant for a misdemeanor committed outside of an officer's presence in violation of the Idaho Constitution. *Id.* at 698, 502 P.2d at 1036. Accordingly, because the breath test on which the Department based Reagan's driver's license

9

suspension violated constitutional standards, the Court affirmed the district court's decision to overturn the suspension. *Id.* at 700, 502 P.2d at 1038.

We find *Reagan* to be dissimilar on several relevant facts: (1) nothing in the opinion indicates that Reagan was anything but calm and cooperative, while Talbert was emotionally erratic and demonstrated behavioral irregularities including inappropriate conversational comments; (2) Reagan's car was parked at her home at the time law enforcement made contact, *id.* at 692, 502 P.3d at 1030; Talbert's car was 70 feet off the highway in the sagebrush following a car crash based on Talbert's unsafe driving pattern; (3) Reagan was in her home cooking dinner, and Talbert was on the side of a highway in a remote area during cold weather; (4) Reagan answered all of the officer's questions and submitted to field sobriety tests with no resistance, *id.* at 697, 502 P.3d at 1035, while Talbert's responses on the accident form were abnormal and her responses to questions were, at times, inappropriate or non-responsive; and (5) although likely only of relatively minor importance, Reagan was told she was under arrest, *id.* at 692, 502 P.3d at 1030, and here, Sgt. Pritchard told Talbert three different times that she was not under arrest and would not be arrested for a misdemeanor even if her breath testing indicated her BAC was over the legal limit. Thus, we do not find *Reagan* to be dispositive in this case.

This Court has previously held that "no such rigid classification defines the boundary between permissible and impermissible detentions. There is no bright line demarcating an unreasonably intrusive investigative detention from a reasonable one. Instead, 'common sense and ordinary human experience must govern over rigid criteria.'" *Stewart*, 145 Idaho at 645, 181 P.3d at 1253. Accordingly, the act of handcuffing Talbert and placing her in the back of Sgt. Pritchard's patrol car did not exceed the bounds of what was reasonable in conducting an investigative detention. As such, the investigative detention for misdemeanor DUI was not so intrusive in manner or length that it became a de facto arrest simply because Talbert was handcuffed and placed in Sgt. Pritchard's patrol car. The district court did not err by denying Talbert's motion to suppress.

## IV.

## CONCLUSION

Talbert was detained, not arrested, to investigate a misdemeanor committed outside of the officer's presence. Accordingly, the district court did not err in denying Talbert's motion to suppress. The judgment of conviction is affirmed.

Judge GRATTON and Judge BRAILSFORD **CONCUR**.